A10A1720, A10A1721. IN RE THE PETITION OF THERESA GOUDEAU TO ADOPT A MINOR CHILD (two cases).
(700 SE2d 688)

BARNES, Presiding Judge.

The superior court denied the petition of Theresa Goudeau to adopt her foster daughter and ordered the Department of Family and

---

[29] *Gibbs v. State*, 217 Ga. App. 614, 616 (458 SE2d 407) (1995).

Children Services to remove the child from Goudeau's foster care, finding that placing the child with Goudeau violated this state's "public policy" because Goudeau was not married to the man with whom she lived. We reverse that portion of the trial court's order directing DFACS, the child's legal guardian, to remove the child from Goudeau's home and "place her with an appropriate custodian." Further, because all of the evidence presented to the court showed that the adoption would be in the child's best interest, the court abused its discretion by denying the adoption petition, and we reverse that portion of the order also.

DFACS took the child, A. C., into custody after she was born in July 2007 with cocaine in her system, and immediately placed her into foster care with Goudeau, where she has remained since she was two days old. Goudeau and Mortimer Lovett were approved as foster parents in 2001, after DFACS conducted an extensive background investigation, and Goudeau and Lovett fostered many children in their home over the next eight years. After A. C. remained in DFACS custody for more than a year, the Department's permanent plan was for her to be adopted. In an order effective March 10, 2009, the juvenile court terminated the parental rights of A. C.'s unknown biological father, found that no suitable relative existed with whom the child could be placed, and re-committed her to the custody of DFACS for adoption. The juvenile court also noted that the child's guardian ad litem recommended that the rights of both parents be terminated, and that A. C.'s biological mother planned to surrender her parental rights and release A. C. to DFACS for adoption. The court specifically noted that the child had "been placed with foster parents who want to adopt and who have been investigated and approved. The child is doing well in current placement."

A. C.'s mother surrendered her parental rights to DFACS and released the child for adoption on March 12, 2009. In November 2009, with DFACS's consent, Goudeau petitioned the superior court to adopt A. C. The petition included the juvenile court's order terminating the biological father's parental rights and the biological mother's surrender of her parental rights to DFCAS and consent to adoption. As required by OCGA § 19-8-16 (a), DFACS conducted "a complete and thorough investigation of the entire matter, including a criminal records check" of the petitioner. Although the superior court initially issued an order to show cause why the petition should not be granted, in January 2010 the court issued another order directing Goudeau to show cause in February 2010 why her petition should not be dismissed and why she should not lose custody of A. C. "because petitioner is and has been living in a meretricious relationship with a man to whom she is not married."

Shortly before the scheduled hearing the trial court appointed a

guardian ad litem to represent A. C.'s interests, as allowed by OCGA § 19-8-17 (c) ("If at any time it appears to the court that interests of the child may conflict with those of any petitioner, the court may, in its discretion, appoint a guardian ad litem to represent the child. . . .").

At the hearing, the guardian ad litem appointed by the court testified that she had interviewed Goudeau, Lovett, and Goudeau's adult daughter; that Goudeau had cared for Lovett's children when they were young; and that 80 foster children had lived with the couple since they were approved as foster parents in 2001. She saw no problems with the family unit or family dynamics, which included aunts, uncles, and other extended family members. The court-appointed guardian ad litem testified that removing A. C. from the only family she had ever known would have a negative impact on her.

Goudeau, 66, testified that she and Lovett, 46, were in a committed relationship and had been together 20 years, treating each other as husband and wife. He was a father figure to her son, and she was a stepmother to his children. They attended the same training programs before being approved to foster children in their home, and had cared for A. C. since she was two days old. She further explained that she had been married twice before, both times to abusive men, and did not want to marry again, although later she clarified that she meant she did not want to marry "by going to a preacher [and] getting it on paper."

The trial court had directed DFACS to present a witness regarding the requirements for adoption, apparently expressing its concern before the hearing about the fact that only Goudeau sought to adopt A. C. and that Goudeau and Lovett were living together but not married. A DFACS adoption coordinator specialist testified that the adoption statute provided that if a person were single, he or she had to be at least 25 years old to adopt, and if married, the petition had to be filed in the name of both spouses. The adoption code does not, however, address other live-in relationships within the household. Absent any statutory directive regarding adoption by single people living with "a significant other," DFACS developed a policy that in such a case, if the single person sought to adopt, the significant other had to attend the same training as the person seeking to adopt. The specialist further noted that the "Foster Parents Bill of Rights" (OCGA § 49-5-280 et seq.), gave a foster parent the right to be considered, where appropriate, as the first choice for a permanent parent if the child became available for adoption. The specialist testified that once a child had been with a foster parent for 12 months, the foster parent had a right to file a grievance if DFACS tried to move the child to other care. Upon questioning by the court, the specialist noted that he could not address the Department's guidelines for

YALE LAW LIBRARY

foster parents, as his specialty was adoption.

The court asked the specialist if he knew what the court was concerned about, and the specialist replied, "I'm honestly not sure except I think it's the fact that they're not married." The court responded, "Absolutely," and the specialist again noted that the adoption code did not address this situation. He further testified that to remove the child from the only stable family she had ever known "would be devastating to that child." Further, the relationship between Goudeau and Lovett was stable and long-term. The court expressed its opinion that it was "standing in the gap because there is nobody to protect this child in a DFACS adoption" once it got to the superior court, and while the relationship between Goudeau and Lovett was of 20 years, "the next week it's 15, and the next year it's 10, and before you know it, we're down to short term meretricious relationships . . . and there is no commitment," with the child "being bounced around" with different adults coming into and leaving her life. The court further expressed its concern that DFACS was allowing unmarried couples to become foster parents, which then allowed one of them to "boot strap" herself into being able to adopt after a year of fostering the child.

In a written order issued a few weeks later on March 12, 2010, the superior court denied the petition for adoption and held that Goudeau and Lovett should not have physical custody of A. C. because of their relationship with each other. The court found no common law marriage existed between Goudeau and Lovett and found that clear and convincing evidence established they were "living in an immoral, meretricious relationship, . . . and that the adoption and their continued custody is inappropriate." Quoting from cases involving illegal contracts, change of custody and visitation cases between divorced parents, and criminal statutes prohibiting sodomy, fornication, and adultery, the court held that allowing a child to be adopted by an unmarried person living with someone else violates Georgia's "public policy," which favors the institution of marriage. The court continued:

> DFACS has adopted a policy, in contravention of Georgia law, that persons living in meretricious relationships may serve as foster parents and adoptive parents. DFACS' Adoption Services Manual (March 2007) expressly confirms this policy by requiring *"significant others"* to attend [adoption orientation and training]. DFACS' policy violates the established public policy and laws of this state favoring the institution of marriage, and declaring meretricious relationships as immoral. Georgia recognizes the legitimacy of married couples and single individuals. It does not recog-

nize any other status, regardless of the mores of some members of society who have thrown off long-standing social, moral, ethical and religious constraints. DFACS' policy offends the laws of this state, the sensibilities of this court, and the common conscious [sic] of the moral, ethical and religious citizens of this state.

(Emphasis in original.) The superior court then stated that it had to rely on DFACS to place a child with qualified adoptive parents, because once a DFACS adoption reached the court no one represents the child, but that in this case it would not rely on the Department's recommendation. "The *trial court* must not only protect the child's best interest, but it must also ensure that an adoption does not violate the public policy or laws of this state. It *cannot* be in a child's best interest to be placed in a household which the courts of this state have condemned as *immoral*." (Emphasis in original.) Contrary to its statement that no one represented the child in a DFACS adoption, the trial court had in fact appointed a guardian ad litem, who testified that this adoption was in the child's best interests.

The court made no other findings regarding whether adoption was in the best interest of the child, but concluded that Goudeau should not be permitted to adopt A. C., and that Goudeau and Lovett should not have custody of A. C. The court never addressed the testimony of the witnesses at the hearing that this adoption was in the child's best interest and that to remove her from this home would be detrimental or devastating to her, focusing instead on perceived public policy violations. In a three-page endnote, the court called on the legislature and appellate courts to address "how cohabitation and immoral conduct affect custody and visitation." Citing its desire for "clear direction," the court then reviewed case law concerning the requirements for establishing a change of custody or visitation between divorced parents, which do not include a showing of harm, only a showing of substantial change.

Both DFACS and Goudeau filed notices of appeal. On March 25, 2010, the day after DFACS filed its notice, the trial court signed a "Notice of Emergency Hearing" for the following day, "[i]n view of the notice of appeal filed by" DFACS. The trial court's notice was filed with the clerk of court on March 26, 2010, setting a hearing at 2:00 p.m. that day "to determine the temporary custodial disposition" of A. C., who was in the Department's custody and placed with Goudeau. DFACS filed an emergency motion with this court on the morning of March 26, 2010. This court granted the motion. In its order this court found that "the child has known no other home than Goudeau's; the Department and the child's guardian ad litem have

each expressed that removing the child from this home would cause the child irreparable harm. . . ."

## Case No. A10A1721

Goudeau appeals the trial court's denial of her petition for adoption. We reverse. The trial court found "public policy" violations in the way DFACS handled A. C.'s placement and its recommendation she be adopted, citing the possibility of future moral harm should the child grow up in a household where the adults were not married.

Contrary to the trial court's declaration of public policy, determining what laws are necessary and proper for the welfare of this State is a function constitutionally vested in the General Assembly, and not the judiciary. Ga. Const. of 1983, Art. III, Sec. VI, Par. I. Moreover, the General Assembly is the proper authority for announcing the public policy of this State. *Country Club Apts. v. Scott*, 246 Ga. 443, 444 (271 SE2d 841) (1980). The General Assembly has carried out both these functions regarding adoption by enacting the laws which have been codified in Chapter 8 of Title 19 of the Official Code of Georgia Annotated and by vesting in the Department of Human Services the authority for implementing these policies. See generally OCGA § 49-5-8 (a) (7). Consequently, as long as these laws are constitutional, neither the superior court nor this court has the authority to amend the law to establish what it deems are better qualifications for those seeking to adopt. The issue for the court was simply to apply the law as written and determine whether it was in the child's best interest to allow the adoption. This the court did not do.

OCGA § 19-8-3 establishes the legal requirements for an adoptive parent. Among other things, the prospective parent must be at least 25 or married and living with his or her spouse, and must be "financially, physically, and mentally able to have permanent custody of the child." OCGA § 19-8-3 (a) (4). If the prospective parent is married, the petition must be filed in the name of both spouses. OCGA § 19-8-3 (c). Otherwise,

> *[a]ny adult person*, including but not limited to a foster parent, meeting the requirements of subsection (a) of this Code section *shall be eligible* to apply to the department or a child-placing agency for consideration as an adoption applicant in accordance with the policies of the department or the agency.

(Emphasis supplied.) OCGA § 19-8-3 (b). The Code also addresses

the termination or surrender by the child's biological parents,[1] describes the necessary contents of the petition for adoption and accompanying paperwork, and includes sample forms for the surrender of parental rights,[2] about which there are no issues in this case.

If the court is satisfied that the rights of any living parents have been surrendered or terminated, that the petitioner is capable of assuming responsibility for the child, that the child is suitable for adoption, and that the adoption requested is in the child's best interest, "it shall enter a decree of adoption." OCGA § 19-8-18 (b). If the court is not satisfied that the adoption is in the child's best interest, "it shall deny the petition." OCGA § 19-8-18 (d).

The trial court in this case did not apply the law to the facts. "The purpose of the hearing upon the petition of adoption is to determine whether the adoption is in the best interest of the child." *Madison v. Barnett*, 268 Ga. App. 348 (601 SE2d 704) (2004). We will affirm the court's decision to grant or deny an adoption petition if any evidence supports it. *Owens v. Watts*, 296 Ga. App. 449, 451 (674 SE2d 665) (2009) (reversing grant of adoption because no evidence it was in child's best interest). The superior court's discretion in this matter, however, is not boundless, but

> is such a discretion as, when applied to a court of justice, means sound discretion guided by law. It must be governed by rule, not by humor; it must not be arbitrary, vague and fanciful, but legal and regular. . . . [D]iscretion is a science or understanding to discern between falsity and truth, between wrong and right, between shadow and substance, between equity and colorable glosses and pretenses, and not to do according to their wills and private affections.

(Citation and punctuation omitted.) *Miller v. Wallace*, 76 Ga. 479, 484 (1886) (reversing trial court's award of custody to grandparents instead of father).

In this case, absolutely no evidence supports the denial of the petition to adopt. All of the witnesses, including the guardian ad litem appointed by the trial court to represent the child's interests and the DFACS adoption specialist, testified that this adoption was in the child's best interest, and that to remove her from the only family she has ever known would be "devastating" to the child. The trial court in its order barely refers to the child's interests, except to make the conclusory finding that her continued exposure to what the

---

[1] OCGA §§ 19-8-4 through 19-8-12.

[2] OCGA §§ 19-8-13, 19-8-26.

court describes as a "meretricious relationship" was not in the little girl's best interest, and "would have an adverse effect on her moral character." Nothing in the record supports this finding. Regardless of the trial court's moral views about unmarried people living together and its conclusion that DFACS acts in contravention of the law by allowing unmarried people to adopt or serve as foster parents, the adoption statute clearly does not prohibit this adoption. It is

> the duty of the judge, in a land jealous of its liberties, to give effect to the expressed sense or words of the law, in the order in which they are found in the act, and according to their fair and ordinary import and understanding; for it must be remembered that the judges are appointed to administer, not to make the law, and that the jurisdiction with which they are entrusted has been defined and marked out by the common law or acts of parliament.

*Miller v. Wallace,* supra, 76 Ga. at 485.

In Georgia, "[t]he General Assembly finds that foster parents providing care for children who are in the custody of the Department of Human Services play an integral, indispensable, and vital role in the state's effort to care for dependent children displaced from their homes," and has granted a foster parent "the right to continue with his or her own family values and beliefs." OCGA § 49-5-281 (a) (3). The General Assembly has also declared it public policy to give a foster parent "the right to be considered, where appropriate, as the first choice as a permanent parent" for a foster child she has kept for more than 12 months. OCGA § 49-5-281 (a) (20). The legislature has directed DFACS to consider the Foster Parents Bill of Rights when developing policies regarding foster care and adoption. OCGA § 49-5-281 (b).

The public policy of this state as enunciated by the General Assembly is to consider the best interest of the child when determining whether she should be adopted. OCGA § 19-8-18 (b). Cases cited by the trial court involving illegal contracts for sex,[3] or custody and visitation battles between divorced parents,[4] are simply not applicable here. Further, in stating that marriage is encouraged, OCGA § 19-3-6 forbids most efforts to restrain or discourage marriage "by contract, condition, limitation, or otherwise."[5] This Code

---

[3] *Abrams v. Massell,* 262 Ga. App. 761, 767 (5) (586 SE2d 435) (2003); *Long v. Marino,* 212 Ga. App. 113 (441 SE2d 475) (1994).

[4] *Todd v. Casciano,* 256 Ga. App. 631 (569 SE2d 566) (2002).

[5] Marriage is encouraged by the law. Every effort to restrain or discourage marriage by contract, condition, limitation, or otherwise shall be invalid and void, provided

section, contained in the original Code of 1863 and last revised in 1933, has nothing to do with the standards the courts must apply in determining whether to allow a child to be adopted. It was cited, for example, in a case approving an employment contract providing that a teacher must remain unmarried, finding that the restraint of marriage was incidental to the lawful purpose of the contract. *Huiet v. Atlanta Gas Light Co.*, 70 Ga. App. 233 (28 SE2d 83) (1943).

The General Assembly has not prohibited unmarried couples from adopting children. This court applies the law, not its personal viewpoint of social mores. No evidence supports the trial court's conclusion that adoption was not in this child's best interest; in fact, all of the evidence was to the contrary. There being no factual support for the trial court's denial of the petition for adoption, we reverse.

## Case No. A10A1720

DFACS also appeals that portion of the trial court's order directing it to remove A. C. from Goudeau's home and "place her with an appropriate custodian within fifteen days from the entry of this judgment." Assuming that the reversal of the trial court's denial of the adoption petition does not render this issue moot, the trial court erred in attempting to direct A. C.'s placement. The Code defines "legal custody" as "a legal status created by court order embodying the . . . right to have the physical possession of the child" and "the right to determine where and with whom the child shall live," subject to the review and oversight of the juvenile court. OCGA § 49-5-3 (12) (A), (D). DFACS has had legal custody of A. C. since the child was born, first because she was determined to be deprived, and then because the juvenile court terminated the unknown father's parental rights and the mother surrendered her parental rights to DFACS for adoption. The Department as legal custodian stands in loco parentis and has all legal rights of a natural parent, including the benefit of a prima facie right to custody. *Drummond v. Fulton County DFACS*, 237 Ga. 449, 458 (4) (228 SE2d 839) (1976), overruled in part on other grounds, *Boozer v. Higdon*, 252 Ga. 276 (313 SE2d 100) (1984). "Once legal custody of a deprived child has been granted to DFACS, any effort by the court to dictate placement of physical custody is 'merely exhortatory and not binding.' [Cit.]" *In the Interest of A. N.*, 281 Ga. 58, 59 (636 SE2d 496)

---

that prohibitions against marriage to a particular person or persons or before a certain reasonable age or other prudential provisions looking only to the interest of the person to be benefited and in general restraint of marriage will be allowed and held valid.

OCGA § 19-3-6.

(2006). It follows that the trial court's order directing DFACS to remove A. C. from Goudeau's home and place her elsewhere improperly "infringed upon the Department's authority to determine the physical placement of children within its custody." *Long v. Long*, 303 Ga. App. 215, 220 (2) (692 SE2d 811) (2010).

*Judgment reversed. Senior Appellate Judge G. Alan Blackburn concurs. Senior Appellate Judge Marion T. Pope, Jr., concurs fully and specially in Case No. A10A1721 and in the judgment only in Case No. A10A1720.*

POPE, Senior Appellate Judge, concurring fully and specially in Case No. A10A1721, and concurring in the judgment only in Case No. A10A1720.

While I concur fully in Case No. A10A1721, I write separately only to point out that while I sympathize with the concerns raised by the trial court, it nevertheless remains true that neither our precedent nor the statutory law of this state prohibit unmarried couples from adopting children.

With respect to Case No. A10A1720, I concur in the judgment only. The issue of whether the trial court erred in directing DFACS to remove A. C. from Ms. Goudeau's home and place her with an appropriate custodian was rendered moot by the majority decision in Case No. A10A1721. Accordingly, the substantive issue of whether the trial court erred in its directive need not be addressed on appeal.

DECIDED AUGUST 27, 2010.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Glover & Blount, Gary A. Glover*, for appellant.

*Tucker, Everitt, Long, Brewton & Lanier, John B. Long, Alice W. Padgett*, for appellee.