**FIFTH DIVISION**
**MCFADDEN, C. J.,**
**MCMILLIAN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**February 24, 2020**

# In the Court of Appeals of Georgia

A19A1668. REDER v. DODDS et al.

MCFADDEN, Chief Judge.

This is a custody dispute between the father and the paternal grandmother of F. R. The father appeals the order awarding custody to the grandmother and requiring him to pay guardian ad litem fees and child support. The father makes four arguments. First, he argues that his rights were violated when the trial court entered an ex parte, emergency custody award, but any error was rendered moot by the court's award of permanent custody. Second, he argues that the evidence does not support the trial court's finding that awarding custody to the grandmother is in the child's best interest, but sufficient evidence supports the trial court's finding. Third, he argues that under the grandparent visitation statute, the grandmother alone must pay the guardian ad litem fees, but the grandparent visitation statute does not apply. Fourth,

he argues that the trial court erred in calculating the child support award without considering the mother's income, but he has not shown harm. So we affirm.

1. *Factual background and procedural posture.*

"When reviewing an order in a child custody case, we view the evidence in the light most favorable to the trial court's decision. We will not set aside the trial court's factual findings if there is any evidence to support them, and we defer to the trial court's credibility determinations." *Mashburn v. Mashburn*, __ Ga. App. __, __ (__ SE2d __) (Case Nos. A19A1616, A19A1617, decided Oct. 31, 2019).

After a four-day bench trial at which thirteen witnesses testified and the trial court interviewed F. R. in chambers, the trial court found the following facts. The father adopted F. R. from Nicaragua in September 2011 when she was six or seven years old. For a period of time, the father and F. R. lived with the grandmother and her husband in Indiana.

The father married a woman who then adopted F. R. He kept the marriage a secret from his family. Less than a year later, they divorced, and the father was granted full legal and physical custody of F. R. The mother was granted visitation, but she did not exercise it and she has no real contact with F. R.

In the summer of 2014, the father and F. R. moved to Chicago. The father remained close with the grandmother and her husband, and the grandmother continued to be significantly involved in raising F. R.

In December 2014, the father married again. He did not discuss his impending marriage with F. R.

The father frequently traveled for business, and his new spouse (F. R.'s stepfather) would provide primary care of F. R. F. R. and her stepfather often traveled to Indiana to visit the grandmother and her husband.

The father, the stepfather, and F. R. moved to the Atlanta area in the summer of 2015. The stepfather continued to provide primary care for F. R. The father and the stepfather divorced, and the stepfather returned to his native Germany. F. R. felt responsible for her stepfather's departure and expressed suicidal thoughts. She expressed suicidal thoughts at other times. The father denied knowing about her suicidal thoughts, although an email to him from the grandmother referenced her past suicidal tendencies.

The grandmother and her husband traveled to Georgia from Indiana to attend F. R.'s fifth grade graduation ceremony. F. R. returned to Indiana with the grandmother and her husband and stayed with them or with the father's sister (F. R.'s

aunt) for much of the summer. After a disagreement, however, the father demanded that F. R. return to Georgia immediately; the grandmother and her husband refused to return F. R. because they believed that F. R. was experiencing an emotional crisis. The father threatened to call the police and eventually retrieved F. R. from Indiana. The father told the grandmother, her husband, and the aunt that they would have no future contact with F. R., and he changed the settings on F. R.'s iPhone and iPad so that they could not reach her directly.

In addition to becoming estranged from his family, the father had become estranged from his former wife, his former husband, his father, and a friend of 18 years, all of whom had relationships with F. R.

Shortly after the disagreement that occurred while F. R. was in Indiana, the father began preparing to move to Mexico. He traveled to Mexico for long periods, leaving F. R. with a friend. F. R. credibly accused the friend's teenaged son of molesting her, but the friend dismissed the accusation as impossible and the father expressed doubts that the accusation was true.

The grandmother filed a petition for grandparent visitation on August 26, 2016. On September 30, 2016, the grandmother and her husband went to F. R.'s middle school to visit her, without her father's permission. After that, the father withdrew F.

R. from public school and begin to home school her. A few days later, on October 4, 2016, the grandmother filed a motion for a temporary restraining order, temporary visitation, and the appointment of a guardian ad litem. The trial court entered an order enjoining the father from removing F. R. from the state of Georgia, granting the grandmother visitation, and appointing a guardian ad litem. Nonetheless, the father refused to allow the grandmother visitation. The grandmother filed a motion to hold him in contempt and she amended her petition to seek legal custody.

On January 1, 2017, the father told F. R. they we moving to Mexico. F. R. was upset. On February 3, 2017, the guardian ad litem sought an emergency, ex parte order in light of the father's arrangements to move F. R. to Mexico. The trial court entered the order and awarded temporary custody to the grandmother. Two days later, U. S. Customs and Border Protection intercepted the father and F. R. in Chicago before they could board a flight. The grandmother picked up F. R. from the airport and she has been with the grandmother ever since.

F. R. is enrolled in school in Indiana and has a significant, stable social network and family support. She sees a psychologist weekly. She is receiving help with her specific learning disorder.

The instability from frequent moves and changes in caregivers, as well as the father's behavior, are emotionally traumatic and harmful to F. R. F. R. told the guardian ad litem and a psychologist who treated her that when she thinks about her father having custody of her, she thinks that she "wouldn't want to live and that kind of stuff."

2. *Ex parte, emergency custody order*.

The father argues that we should reverse the custody award because the ex parte, emergency order removing F. R. from his custody violated his constitutional rights. "Th[e] final order renders any issues regarding the validity of the temporary order moot." *Roberts v. Kinsey*, 308 Ga. App. 675, 678 (4) (708 SE2d 600) (2011). See also *Edwards v. Edwards*, 226 Ga. 875, 878 (2) (178 SE2d 168) (1970) (same).

3. *Custody award*.

The father argues that we should reverse the custody award because the trial court applied the wrong law and the grandmother failed to meet her burden of proof. We hold that the trial court applied the correct law and that the grandmother presented sufficient evidence to support the custody award.

(a) *Applicable law*.

6

The father argues that the trial court applied the wrong law. We disagree because the trial court applied the correct statute, OCGA § 19-7-1 (b.1), and binding Supreme Court authority.

OCGA § 19-7-1 (b.1) applies to "any action involving the custody of a child between the parents or either parent and a third party limited to grandparent[ or other close relatives]." Under the statute, "[t]he sole issue for determination . . . [is] what is in the best interest of the child. . . ." Id. The statute establishes "a rebuttable presumption that it is in the best interest of the child . . . for custody to be awarded to the parent . . . of such child. . . " OCGA § 19-7-1 (b.1). That presumption may be rebutted, however, by showing

> with clear and convincing evidence, that the child will suffer either physical harm or significant, long-term emotional harm if custody is awarded to the parent. In addressing the issue of harm, trial courts must consider a variety of factors beyond biological connection or generalized notions of parental fitness. They also must consider the parental needs and the circumstances of the child in question, including (1) who are the past and present caretakers of the child or children; (2) with whom has the child or children formed psychological bonds and how strong are these bonds; (3) have the competing parties evidenced interest in, and contact with, the child or children over time; and (4) are there any unique medical or psychological needs of the child or children.

*Strickland v. Strickland*, 298 Ga. 630, 631 (1) (783 SE2d 606) (2016) (citations omitted). In his detailed order, the trial court expressly applied the statute, considered the four factors identified by our Supreme Court, made findings of fact, applied the findings to the factors, and concluded that the grandmother had established by clear and convincing evidence that F. R. would suffer significant, long-term emotional harm were the father to receive custody. Consequently, the court concluded that awarding custody to the grandmother was in F. R.'s best interest.

The father argues that the analysis from *Strickland* applies only in cases where a parent seeks to regain custody of a child. Here, he argues, the grandmother should have been required to prove that he was an unfit parent because she sought to remove F. R. from his custody. But we have applied the analysis from *Strickland* to other cases where children were removed from the parent's custody and custody was awarded to the grandparents, and *Strickland's* analytical framework applies. See *Mashburn v. Mashburn*, __ Ga. App. __ (__ SE2d __) (Case Nos. A19A1616, A19A1617, decided Oct. 31, 2019). The trial court applied the correct law, so the father has not shown reversible error in this regard.

(b) *Sufficiency of the evidence*.

The father argues that the grandmother failed to show by clear and convincing evidence that F. R. will suffer either physical harm or significant, long-term emotional harm if custody were awarded to the father. The evidence described in Division 1, supra, was sufficient to support the trial court's findings regarding the four factors and his conclusion that F. R. will suffer significant, long-term emotional harm if custody were awarded to the father.

The court expressly made factual findings about the four factors it was required to consider in addressing the issue of harm. *Strickland*, supra, 298 Ga. at 631 (1). As for the first factor — who are the past and present caretakers of the child — the court found that F. R. has had a number of different caregivers over her life, but the grandmother and her husband were the caregivers with whom F. R. has had the most significant and stable relationship. As for the second factor — with whom has the child formed psychological bonds and how strong are these bonds — the court found that F. R. had formed strong psychological bonds with the grandmother and her husband, with her aunt, and with the father's friends. The court found that F. R. is attached to her father but that her feelings for him are conflicted. The court found that the grandmother and her husband were less likely than the father to sever through estrangement previously created strong psychological bonds between F. R. and

9

others. As for the third factor — have the competing parties evidenced interest in, and contact with, the child over time — the court found that both the father and the grandmother and her husband have evidenced interest in and contact with the child over time, but that the father's contact has been inconsistent, given that he did not exercise his full visitation rights during the pendency of the case. As for the fourth factor — are there any unique medical or psychological needs of the child — the court found that F. R. has significant needs for support, stability, consistency, and engaged parenting because of her history of frequent changes in her primary caregivers and the frequent severing of important relationships, and that the grandmother and her husband are better able to meet those needs. The evidence at the hearing, recounted above, supports these findings.

4. *Guardian ad litem fees*.

The father argues that the trial court erred in ordering him to pay a portion of the guardian ad litem fees because under the grandparent visitation statute, the grandmother was solely responsible for the fee. See OCGA § 19-7-3 (e) (1) ("If the court finds that the family member [seeking visitation] can bear the cost without unreasonable financial hardship, the court, at the sole expense of the petitioning family member, may: Appoint a guardian ad litem for the minor child[.]"). But the

case did not proceed under the grandparent visitation statute. Although the case was initiated as a grandparent visitation action, the grandmother amended her petition to proceed under OCGA § 19-7-1 (b.1) to seek custody. Nothing in that statute requires guardian ad litem fees to be borne solely by the petitioner.

5. *Child support.*

The father argues that the trial court erred in establishing the child support award because it did not consider the income or circumstances of the mother. Any error does not entitle him to reversal, however, because it did not harm him.

Although the mother was served with the pleadings in this matter, she failed to appear. The trial court ordered her to pay $236 per month in child support. The father does not explain how any error in the calculation of the mother's child support obligation affects his separate child support obligation. "In order to constitute reversible error, both error and harm must be shown." *Pearlman v. Pearlman*, 238 Ga. 259, 260 (2) (232 SE2d 542) (1977). The father has not shown how he was harmed by the calculation of the mother's child support obligation. "[T]herefore, no reversible error appears." Id.

*Judgment affirmed. Senior Appellate Judge Herbert E. Phipps concurs. McMillian, P. J. concurs in the judgment only.**

**\* THIS APPEAL IS PHYSICAL PRECENDENT ONLY.  COURT OF APEALS RULE 33.2 (a).**